IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**WESLEY ODOM,**

     **Plaintiff,**

**v.**                                 **CASE NO. 3:11-cv-75-RS-EMT**

**CITIGROUP GLOBAL MARKETS
INC., and CITIGROUP INC.,**

     **Defendants.**

_____/

## <u>ORDER</u>

Before me are Defendant's Motion for Summary Judgment (Doc. 130),

Defendant's Statement of Undisputed Facts in Support of Motion for Summary

Judgment (Doc. 131), Plaintiff's Memorandum in Opposition to Defendant's

Motion for Summary Judgment (Doc. 140), Plaintiff's Statement of Material Facts

in Dispute (Doc. 141), and Defendant's Reply in Support of Motion for Summary

Judgment (Doc. 155).

This is a whistleblower case. Wesley Odom, a financial adviser, has sued his

former employer, Citigroup, for firing him after he complained about Citigroup

policies that he believed violated the securities laws. He objected to Citigroup's

directives to its advisers to (1) market high-interest checking accounts called

Citigold accounts, and (2) refrain from advising their clients to sell Citi preferred

securities. Citigroup counters that these directives were legal, and in any event, they fired him because he violated company policies and seemed to be trying to redirect their clients to his own startup investment firm.

After review, I find that Odom's whistleblower claim about the Citigold accounts fails as a matter of law, because marketing these accounts could not have been illegal. However, triable issues of fact remain in his claim about the Citi preferred securities, and that claim must proceed to trial. Defendant's motion for summary judgment is therefore granted in part and denied in part.

## I.     STANDARD OF REVIEW

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 , 91 L. Ed. 2d 202 (1986).  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then

2

a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).  However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II.   <u>BACKGROUND</u>

I accept the facts in the light most favorable to Plaintiff.  *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008).  All reasonable doubts about the facts shall be resolved in favor of the non-movant.  *Id.*

### *a.   Facts*

Plaintiff Wesley Odom was employed for 17 years as a financial advisor in the Pensacola, Florida, office of Smith Barney, then a division of Defendants Citigroup Global Markets Inc. and Citigroup Inc. (Doc. 140 at 1). In May 2009, Odom received a "resign or be fired" ultimatum from his supervisor, Helene Botos, and chose resignation. (*Id.* at 8). Odom contends that he was fired for voicing opposition to illegal practices by Citigroup; Citigroup responds that they fired him for violating company policies.

The problems appear to have begun at the height of the global financial crisis in late 2008 and early 2009. (*Id.* at 2). Citigroup encouraged its financial advisers to "aggressively market" two different financial products to their clients. (*Id.* at 3-5). First, advisers were asked to market "Citigold" checking accounts, high-fee checking accounts that Odom believed were unsuitable for his clients. (*Id.* at 3-4). He told Botos that he would not promote them to his clients. (*Id.*). Second, advisers were asked to market Citi's own preferred securities, which at the time were very risky investments. (*Id.* at 4-5). Citigroup ordered its advisors not to encourage their clients to sell the securities and not to recommend sell orders without lengthy legal disclaimers. (*Id.*). Odom again objected to and refused to participate in this practice. (*Id.*).

Odom's alleged clash with management over these issues came to a head on May 4, 2009, when Botos learned that Odom had sent his client a letter. (*Id.* at 6). Botos stated she believed this communication with a client to violate company protocol. (*Id.*). As she was investigating the letter, she also did some research and discovered that Odom had founded his own investment firm without informing her. (*Id.* at 6-7). After calling and consulting her superiors in Atlanta, and purportedly based on these two violations of company policy, she came to Odom's office the same day and gave him the "resign or be fired" ultimatum. (*Id.* at 7).

The first purported violation of company policy involved another investment firm that Odom formed in early 2009 called Armada Advisors, Inc. (*Id.* at 2). Odom contends that he formed the firm as a backup option in case he was laid off from his current employment in the wake of then-developing financial crisis. (*Id.*). He argues that forming the firm was not in violation of company policy, because he had not yet (in 2009) had the opportunity to disclose it at his annual review, as required by the company's disclosure policy.

Citigroup, however, claims that forming the firm was in violation of company policy. The Smith Barney 2009 U.S. Employee Handbook and the Compliance Desk Top Reference manual explicitly require prior approval before employees engage in outside activities such as directorships of corporations. (Doc. 131 at 7-9).

The second purported violation of company policy involved the letter that Odom had sent to a client. The letter was regarding a proposed joint venture between Smith Barney and Morgan Stanley, another investment firm. (*Id.* at 2-3). In April 2009, Smith Barney customers were sent a document describing the merger and the procedures for opting-out. (*Id.*). According to Odom, when one of his clients asked him about the opt-out procedure, he sent her a sample opt-out form consistent with the company's own form. (*Id.*).

Citigroup viewed the letter much differently. Botos found out about the letter when a client called and asked to speak to a branch manager about a strange communication. (Doc. 131 at 2). The communication was not on Smith Barney letterhead and requested the Smith Barney accounts not to be transferred to Morgan Stanley but "to another firm." (*Id.*). Because the form was not preapproved, Citigroup maintains that it violated its correspondence policy, which required approval from a branch manager of all communications regarding firm business and imposed record-keeping requirements. Furthermore, Botos was concerned Odom was attempting to transfer Smith Barney clients elsewhere. (Doc. 130 at 3). This concern is allegedly what led her to research his outside activity and discover Armada Advisers. (*Id.*).

Odom counters that sending this single form was not in violation of the correspondence policy and, regardless, it was not the company's practice to immediately fire employees for violating either of these policies. (Doc. 140 at 8). Furthermore, he says that before Botos found out about either of these purported policy violations, Botos had asked him to a sign a form releasing any claims Odom had against the company. (*Id.* at 5). When he refused to sign, a regional manager from Atlanta came to Odom's office to urge and pressure him to do so. (*Id.*; Doc. 155 at 6). The form presented to Odom, which contained the release language, was

different from the form presented to at least some other financial advisors. (Doc.

140 at 5; Doc. 155 at 6).

Either way, after learning of the alleged policy violations on May 4, Botos

returned to Odom's office and gave him the ultimatum. (*Id.* at 7-8). Odom

immediately resigned from Smith Barney rather than be fired. (*Id.*).

### *b.    Procedure*

Odom filed suit in state court on January 6, 2011, alleging unpaid wages

(Count I), conversion (Count II), violations of the Florida Whistle-Blower Act

(Count III), fraud (Count IV), negligent misrepresentation (Count V), and

violations of the Securities Exchange Act of 1934 and Rule 10b-5 (Count VI).

Citigroup properly removed the case to this Court on the basis of both federal

question jurisdiction and diversity jurisdiction.

On June 6, 2011, Counts III, IV, V, and VI were transferred to the Southern

District of New York for consolidated discovery as part of *In re: Citigroup Inc.*

*Securities Litigation*, MDL No. 2070. (*See* Doc. 18). The parties later stipulated to

the dismissal of Counts I and II, as well as Citigroup's counterclaims. (*See* Doc.

59).

More than two years after the transfer, on December 13, 2013, the Southern

District of New York dismissed with prejudice Counts IV, V, and VI and

remanded Count III, the Florida Whistleblower Act claim, to this Court. (*See*

*Odom v. Morgan Stanley Smith Barney, LLC*, 1:11-cv-03827-SHS, Doc. 40 (S.D.N.Y. Dec. 13, 2013)).

The litigation resumed in this Court for Count III, the only remaining claim, in February 2014. (*See* Doc. 75). I denied Citigroup's motion to dismiss for failure to state a claim on August 1, 2014. (*See* Doc. 109). After additional discovery, Citigroup now moves for summary judgment.

### III.   <u>DISCUSSION</u>

Citigroup contends that Odom's Florida Whistleblower Act (FWA) claim should be dismissed as a matter of law because Odom has failed to make a prima facie case for violation of the Act, because it offered a non-discriminatory reason for terminating him, and because its reasons were not pretextual.

The Florida Whistleblower Act (FWA), codified as Florida Statutes § 448.102, prohibits retaliatory action against an employee who "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. §448.102(3). Federal courts use the *McDonnell Douglas* burden-shifting framework to evaluate FWA claims at summary judgment. *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000). First, a plaintiff has the initial burden of proving a prima facie case. *Id.* Second, the burden shifts to the defendant to proffer a legitimate reason for the

adverse action. *Id.* Third, the burden shifts back to the plaintiff to prove that the proffered reason is merely a pretext for illegal conduct. *Id.*

### a.      The Prima Facie Case

To establish a prima facie case under the FWA, a plaintiff must establish three elements.  First, the plaintiff must have engaged in some statutorily protected expression. *See Castillo v. Roche Labs., Inc.,* 467 F. App'x 859, 862 (11th Cir. 2012).  Second, the plaintiff must have suffered an adverse employment action. *Id.* Finally, the adverse employment action must have been causally linked to the plaintiff's protected expression. *Id.*

### 1. Statutorily Protected Expression

Odom argues that his refusal to participate in marketing the Citigold checking accounts and the Citi preferred securities, and his objections to the firm's policies regarding these accounts, was expression protected by the FWA.[1] Citigroup counters that his activity is not protected because their conduct was not illegal, and he has not proved an actual violation of a law.

### A. The proper legal standard: "actual violation" vs. "reasonable belief"

To establish protected expression under the FWA, a plaintiff must show that he objected to or refused to participate in an illegal activity, policy, or practice of

---

[1] In his Amended Complaint (Doc. 122), Odom also alleged that he engaged in protected activity by opposing Citi's policy of prohibiting advisors from advising clients regarding financial impact of the joint venture. However, Odom has not pressed this line in his Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 140), and so it appears abandoned.

an employer. Fla. Stat. §448.102(3); *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Dist. Ct. App. 2013). The parties dispute, however, the proper standard for what constitutes "illegal."

Citigroup argues that the approach followed by numerous federal district courts and unpublished Eleventh Circuit opinions should govern. These courts require the plaintiff to prove that an actual violation of the law occurred in order to benefit from FWA protection. *See*, e.g., *Smith v. Psychiatric Solutions, Inc.*, 358 F. App'x 76, 78 (11th Cir. 2009); *White v. Purdue Pharma., Inc.,* 369 F. Supp. 2d 1335, 1337 (M.D.Fla.2005) ("[A] Plaintiff, in order to prevail under a Florida Whistle-Blower action . . . must prove that the activity, policy or practice objected to *is,* in fact, in violation of a law, rule or regulation.").[2]

Odom counters that the long-standing rule has changed. In 2013, the Florida Fourth District Court of Appeals, with little analysis, applied a different rule. The court held that, in meeting the "illegal" standard for a FWA claim, "all that is required is that the employee have a good faith, objectively reasonable belief that

---

[2] *See also United States ex rel. Vargas v. Lackman Food Svc., Inc.*, 510 F. Supp. 2d 957, 968 (M.D. Fla. 2007); *Smith v. Psychiatric Solutions, Inc.*, 3:08CV3/MCR/EMT, 2009 WL 903624, at *7 (N.D. Fla. Mar. 31, 2009); *Paulet v. Farlie, Turner & Co., LLC*, No. 10-21021-CIV, 2010 WL 2232662, at *2 (S.D. Fla. June 2, 2010); *Gibson v. Walgreen Co.*, 6:07-CV-1053-ORL-28KRS, 2010 WL 366130, at *10 n.13 (M.D. Fla. Jan. 19, 2010); *Colon v. Total Renal Care, Inc.*, No. 8:07-cv-151-T-26MAP, 2007 WL 4145940, at *2 (M.D. Fla. Nov. 19, 2007); *Blanche v. Airtran Airways, Inc.*, No. 8:01cv1747-T-30MSS, 2005 WL 1051097, at *2 (M.D. Fla. May 2, 2005); *Hogan v. Country Club of Brevard, Inc.*, No. 604CV272ORL31JGG, 2005 WL 1572985, at *7 (M.D. Fla. July 1, 2005); *Barlow v. Conagra Foods, Inc.*, No. 804CV2286T17TGW, 2005 WL 3133474, at *4 (M.D. Fla. Nov. 23, 2005).

h[is] activity is protected by the statute." *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Dist. Ct. App. 2013) (citations and quotations omitted). The court cited to a federal court opinion, *Luna v. Walgreen Co.,* 575 F. Supp. 2d 1326, 1343 (S.D.Fla.2008), which applied the "objectively reasonable belief" standard simultaneously to both an FWA claim and an Americans with Disabilities Act claim. *Luna* appeared to conflate the FWA and ADA standards.

Only a handful of courts, all federal, have acknowledged *Aery*. Two declined to address the apparent split of authority. *See Bonnafant v. Chico's FAS, Inc.*, No. 2:13-CV-893-FTM-29CM, 2014 WL 1664554, at *4 (M.D. Fla. Apr. 25, 2014); *Denarii Sys. LLC v. Arab*, No. 12-24239-CIV, 2014 WL 2960964, at *3 n. 4 (S.D. Fla. June 30, 2014). Another rejected the majority rule and applied the new *Aery* rule. *See Hernandez v. Publix Super Markets, Inc.*, No. 14-20491-CIV, 2014 WL 1379141 (S.D. Fla. Apr. 9, 2014).

I agree with the well-reasoned order of the *Hernandez* court that *Aery* changed the rule and now governs FWA cases. While the federal courts developed the "actual violation" standard, no state court opinion that carries binding authority appears to have ever addressed the issue, stated the rule, or even cited approvingly to a federal court's articulation of the rule. Rather, *Aery* is the only binding Florida state court authority on the matter.

When interpreting state law, federal courts must apply the substantive law of the state. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where no Florida Supreme Court precedent exists on a matter, federal courts are bound to adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication the state's highest court would decide the issue otherwise. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014). Although the *Aery* court's reasoning is minimal, and its logic is questionable, it is the only binding statement of authority on the matter from any of the Florida appellate courts. Unless and until another Florida appellate court disagrees with *Aery*, or there is some other indication that the Florida Supreme Court would change the rule, *Aery* states the rule on the matter, and I am bound to follow it.

I therefore hold that, under the new rule stated in *Aery*, in claims brought under the Florida Whistleblower Act, Fla. Stat. §448.102(3), an employee need only demonstrate that he had a "good faith, objectively reasonable belief" that the conduct that the employee objects to is illegal; the conduct does not need to actually violate the law. *Aery*, 118 So.3d at 916. If the employee demonstrates such a reasonable belief, he satisfies the "protected activity" prong of the prima facie case for an FWA claim.

I now apply this rule to Odom's objections to the two purported illegal activities of Citigroup—the aggressive marketing of the Citigold checking accounts and the Citi preferred securities.

### B.  The Citigold Checking Accounts

Odom argues that Citigroup's aggressive marketing of the high-fee Citigold Checking accounts violated Rule 10b-5.

Rule 10b-5 was promulgated under § 10(b) of the 1934 Securities Exchange Act. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 156-57, 128 S. Ct. 761, 768, 169 L. Ed. 2d 627 (2008). The rule makes it illegal to

> "(a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b-5.

In the case of the Citigold checking accounts, it is apparent, and the parties do not appear to dispute, that the checking accounts are not securities. *See* 15 U.S.C. § 77b(a)(1); *Marine Bank v. Weaver,* 455 U.S. 551, 555, 102 S. Ct. 1220, 1223, 71 L. Ed. 2d 409 (1982) (holding that certificate of deposit was not a security); *Lenczycki v. Shearson Lehman Hutton, Inc.*, No. 88 CIV. 9262 (RWS), 1990 WL 151137, at *5 (S.D.N.Y. Sept. 29, 1990) (noting that "interest-bearing

checking account" was not a security). There is therefore no conceivable way for Citigroup's conduct in marketing the checking accounts to violate Rule 10b-5, which applies only "in connection with the purchase or sale *of any security*." (Emphasis added).

Odom is required only to prove a "good-faith, objectively reasonable belief" that a violation occurred, rather than prove an actual violation of the law. *Aery*, 118 So.3d at 916. However, as to the checking accounts, Odom is not able to prove even a reasonable belief that he engaged in protected activity. Odom was an experienced financial adviser with a large, respected financial institution. Under the objective *Aery* test, no reasonable experienced financial adviser would believe that conduct in marketing checking accounts, which are not securities, violated the securities laws. Additionally, Odom cannot disclaim ignorance of the substantive law to argue that his belief was reasonable. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002). And, other than Rule 10b-5, Odom has not advanced any other theories for why the aggressive marketing of the checking accounts was illegal.

It is irrelevant whether marketing the checking accounts violated any FINRA rules regarding suitability. FINRA rules, which are privately enforced, do not appear to qualify as a "law, rule, or regulation" under the FWA. Fla. Stat. §448.102(3). FINRA is a private securities organization responsible for discipline

of its members who violate its rules. *See Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 571 (2d Cir. 2011); 15 U.S.C. § 78o-3(b).

I therefore find as a matter of law that Odom has failed to meet his burden of proving that he had an objectively reasonable belief that Citi's conduct in marketing the checking accounts was illegal. Odom thus did not engage in any protected expression, and his FWA claims about the Citigold checking accounts are dismissed with prejudice.

## C.  The Citi Preferred Securities

On the other hand, it is undisputed that the Citi preferred securities are securities potentially subject to Rule 10b-5. Specifically, Odom contends that Citi's instructions to its financial advisers about the preferred securities violated the prohibition against making investment recommendations that are not suitable for a client. *See Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993) (recognizing § 10(b) unsuitability claim where financial adviser knowingly recommended purchase of securities unsuited to the buyer's needs); *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 897-98 (10th Cir. 1992); *Sec. & Exch. Comm'n v. Solow*, No. 06-81041 CIV, 2007 WL 1970806, at *3 (S.D. Fla. May 10, 2007), *aff'd*, 308 F. App'x 364 (11th Cir. 2009).

Odom testified that that Citigroup instructed its financial advisors that they could not advise their clients to sell the preferred securities and that they did not

fully disclose the risks involved with the securities. (Doc. 140 at 4). Botos, in an email, instructed advisers that "Solicitation of sells on Citigroup preferred securities may not take place until [a] Disclosure Statement[3] . . . is verbally conveyed" to clients. (Doc. 131-21). This email and the requirement of the confusing disclaimer appear to serve as evidence of a policy of at least discouraging sell recommendations, even as to securities that became unsuitable for the clients.

This evidence, when taking all of the disputed facts in the light most favorable to the plaintiff, is sufficient to show that Odom had at least an objectively reasonable belief that Citigroup was violating the securities laws. The evidence shows that Odom could have reasonably believed that Citigroup had a policy of forbidding, restricting, or at least strongly discouraging its advisers from advising clients to sell securities that became unsuitable to their needs. Such a policy could violate Rule 10b-5, which has been interpreted by numerous courts and the SEC, by way of "unsuitability claims," to forbid financial advisers from intentionally advising their clients to make unsuitable investment decisions. Such a policy would likewise amount to "reckless disregard for the investor's interests."

---

[3] The 86-word disclosure statement states that "On February 6, 2009, Fitch downgraded the rating on Citigroup' s Preferred Securities from BBB to BB. Moody's currently rates Citigroup's Preferred stock structures Baa3 with a negative watch and Trust structures A3 with a negative watch. S&P rates Citigroup's Preferred Securities BB. The recent ratings actions taken by Fitch lowered the composite rating on Citigroup's Preferred Securities to below investment grade. Citigroup is an affiliate of Citigroup Global Markets Inc. (CGMI). CGMI is rated A2 negative watch by Moody's and A stable outlook by S&P." (Doc. 131-21).

*O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 (10th Cir. 1992). *See also In the Matter of Olde Disc. Corp.,* 67 S.E.C. Docket 2045 (Sept. 10, 1998) ("Making unsuitable recommendations to customers without disclosing the unsuitability of those solicited investments, in breach of an affirmative duty to disclose arising from a fiduciary or similar relationship of trust and confidence, violated [Rule 10b-5].").

Citigroup's argument that the activity could not be illegal because it involved only holding securities, rather than purchasing or selling them, has no merit. It is true that plaintiffs in private 10b-5 actions may not recover for fraud manifested in the mere holding, rather than purchase or sale, of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755, 95 S. Ct. 1917, 1934, 44 L. Ed. 2d 539 (1975). However, the *Blue Chip Stamps* rule only governs the judicially-created private 10b-5 action and does not address illegality of making hold recommendations in violation of the securities laws. Rather, the Eleventh Circuit has noted that the securities laws, as enforced to their fullest extent by the SEC, apply to "holders of securities."  *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1348 (11th Cir. 2008). If it were reasonable for Odom to believe that Citigroup's alleged conduct, even though it involved only "hold" decisions, was illegal and could be prosecuted by the SEC, then he satisfies the "illegality" threshold of the FWA.

It is true that, even within the realm of the SEC enforcement powers, which are broader than private 10b-5 actions, holder unsuitability claims are a novelty. Nonetheless, the question before me is not whether such prosecution would actually be valid, but rather whether Odom could have reasonably believed that it is valid. "Reasonable belief" includes both a subjective and objective component. *Gale v. U.S. Dep't of Labor*, 384 F. App'x 926, 929 (11th Cir. 2010). In this case, I ask whether it was objectively reasonable for an experienced financial adviser to believe that the conduct violated the securities laws.

The SEC has stated that violations based on unsuitable trading recommendations occur when (1) the securities recommended are unsuitable to the client's needs; (2) the broker knew or reasonably believed that the securities were unsuited to the client's needs; (3) the broker recommended the unsuitable securities anyway; and (4) the broker, with scienter, made material misrepresentations (or failed to disclose material information) relating to the suitability of the securities. *In the Matter of Geoffrey A. Newman*, 70 S.E.C. Docket 1051 (Sept. 2, 1999).

Given that SEC enforcement powers extend to holder claims, and there appears to be no law stating that such claims are beyond the enforcement powers of the SEC, Odom could have at least reasonably believed that such claims are within the SEC's enforcement power. Applying the elements of an unsuitability claim to a holder claim, it could have been reasonable to believe that Citigroup's

blanket hold recommendation could have violated the securities laws: (1) the securities could have become unsuitable for the client's needs; (2) the broker could have known that the securities were unsuited to the client's needs; (3) the broker could have failed to recommend the sale the of the unsuitable securities, based on the directives and pressure from management; and (4) the broker, with scienter, could have failed to disclose material information relating to the suitability of the securities, based on the directives and pressure from management.

It was reasonable for Odom, as an experienced stockbroker, to believe that a blanket hold directive would have caused financial advisers to make unsuitable recommendations and withhold material information regarding suitability from clients, and it was reasonable to believe such conduct violated the securities laws. When Odom objected to the conduct that he reasonably believed was illegal, he engaged in protected activity.

Therefore there exists at least a triable issue of fact as to whether Odom engaged in protected activity with respect to the Citi preferred securities—that is, whether he could have reasonably believed that Citigroup engaged in illegal conduct and objected to that conduct.

### 2.   *Adverse Employment Action*

Citigroup next contends that, even if Odom engaged in protected activity, he did not suffer an adverse employment action because he resigned voluntarily.

Citigroup relies on *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995), in which the court ruled, although in a due process rather than employment retaliation context, that "there are two situations in which an employee's resignation will be deemed involuntary, and thus a deprivation of due process: (1) where the employer forces the resignation by coercion or duress; or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Id.* at 1568.

It is unclear whether *Hargray* applies to retaliation against an at-will employee of a private corporation. At least one court has held that it does not. *See Andazola v. Logan's Roadhouse Inc.*, 871 F. Supp. 2d 1186, 1208 (N.D. Ala. 2012). I need not decide whether it does, however, because it appears that the rule in *Hargray* is not broad enough to cover the facts of Odom's termination, taken in the light most favorable to him. The *Hargray* court emphatically noted that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges," *Hargray*, 57 F.3d at 1568, because in such cases 'the fact remains that plaintiff *had a choice.* [Plaintiff] could stand pat and fight.'" *Id.* (citations and quotations omitted) (emphasis in original).

Odom, under his version of the facts, was given an immediate "resign or be fired" ultimatum. He had the choice of (1) resigning, or (2) declining resignation

and being fired seconds later. Odom, unlike Hargray, did not have the alternative between resignation and "facing possible termination." He had the alternative between resignation and facing definite, immediate termination. He likewise did not have an opportunity to "stand pat and fight;" it was made clear that no matter what he chose, that was the last time he was ever going to be in his office.

Odom's situation is more appropriately analyzed under an "actual termination" theory. "The inquiry as to whether actual termination has occurred involves analysis of the employer's intent." *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1434 (11th Cir. 1997). Here, Citigroup intended to have Odom walk out of his office that day unemployed; they were simply generous enough to give him the choice to avoid the stigma of direct termination.

Where, as here, an employee is given a choice between *immediate* resignation and *immediate* termination, the employee does not have a choice at all under *Hargray*; rather, the employee has been terminated. Odom has therefore raised a triable issue of fact as to whether he suffered an adverse employment action.

### 3.  *Causal Connection*

Citigroup next argues that even if Odom engaged in protected expression and suffered an adverse employment action, the two were not causally related.

The causation requirement is "broadly construed," and a plaintiff may establish a prima facie case for retaliation so long as the protected activity and the adverse employment action are not completely unrelated. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). This causation may be established by temporal proximity, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004), as well as by showing that an employer knew of a protected activity and adverse employment actions commenced shortly thereafter, *Jiles v. United Parcel Serv., Inc.*, 360 F. App'x 61, 66 (11th Cir. 2010), *citing Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

Citigroup argues that the four-to-seven month gap between Odom's objections to the preferred securities and his termination is too long to establish causation. *See, e.g., Higdon*, 393 F.3d at 1221 (three and four month periods, standing alone, did not imply causation).

Here, it is undisputed that Citigroup knew about the purportedly protected activity of objecting to the blanket hold instructions. So there is more than mere temporal proximity. Furthermore, construed in the light most favorable to Odom, Citigroup may have had a reason to delay firing him. Citigroup claims that it had a widespread policy of offering employees financial incentives to employees who agree to release any potential claims against it. (Doc. 155 at 6). Citigroup, in a seemingly unique fact pattern in retaliation jurisprudence, would have had an

incentive to wait to fire Odom until after he waived his claims. It was not clear that Odom declined to sign the claims form until late March of 2009—barely a month before he was terminated. (*Id.*). The Eleventh Circuit has held that a one-month time frame, combined with knowledge of the protected activity, is sufficient to find causal relation. *See Wideman*, 141 F.3d at 1457.

Odom has therefore raised a triable issue of fact as to whether his termination was causally related to his protected activity, and thus has met his burden of establishing a prima facie case for retaliation in violation of the FWA.

### b.      *Pretext*

Because Odom, under the version of the disputed facts most favorable to him, has made out a prima facie case for FWA retaliation, the burden shifts to Citigroup to proffer legitimate, non-retaliatory reasons for his termination. *Castillo*, 467 F. App'x at 862-63. Citigroup argues that it fired Odom for violating two of its policies—the prohibition on unauthorized communications and the prohibition on engaging in unapproved outside business activity. (Doc. 130 at 20).

Odom appears to concede that these reasons are legitimate and non-retaliatory, but argues that they are nonetheless merely a pretext for firing him. Once a defendant has proffered legitimate reasons for the termination, the plaintiff has the opportunity to respond to those reasons and argue that they are a pretext for the termination. *Castillo*, 467 F. App'x at 862-63. Odom argues that Citigroup's

proferred reasons are pretextual because of timing issues surrounding his termination, and because they failed to follow their own enforcement procedures of their policies.

To show pretext, a plaintiff must demonstrate that the proffered reason was not the true reason for the termination, either by directly showing that the discriminatory reason more likely motivated the decision or by indirectly showing that the proffered explanation is unworthy of credence. *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). The plaintiff must produce enough evidence of allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable. *Id.*

Here, Odom has demonstrated sufficient "inconsistencies" and "weaknesses" in Citigroup's explanation to allow a reasonable factfinder to conclude that its stated reasons for his termination are "unworthy of credence." *Jackson*, 405 F.3d at 1289. He has pointed to several pieces of evidence that, taken in the light most favorable to him, could convince a reasonable jury that Citigroup's stated termination reasons are a pretext for firing him for objecting to the blanket hold order on the securities.

First, there is a triable issue of fact whether Odom's actions actually violated the policies of Citigroup, at least in the way that Citigroup normally enforced them

in his 17 years of employment. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*,

439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own

standard procedures may serve as evidence of pretext.").

As to the communication, the parties dispute the significance of and

meaning of the communication. Odom testified that he sent the form in response to

a customer request for a sample opt-out form to opt out of the forthcoming joint

venture with JP Morgan, and that the form was substantially similar to a form that

was already approved by Citigroup. Citigroup, either in its motion or its reply

brief, does not appear to directly rebut this contention. Instead, Citigroup argues

that it appeared to be an attempt to by Odom to transfer the clients to a different

firm, presumably his own Armada Advisers.  While there are weaknesses in

Odom's argument—the document was not on Smith Barney letterhead or

envelopes, and the language "to another firm" seems unusual—a reasonable jury

could weigh the evidence and determine that Odom had not violated the

unapproved communication policy, or at least committed a fairly minor violation.

As to the business activities, Odom testified that in the Pensacola branch, in

practice, all employees disclose any outside business activities at their annual

review (which had not yet occurred in 2009), rather than preemptively as the firm's

formal policies require. Citigroup counters that while this was may have been true

of many minor outside activities, it would not be true in the case of forming a

potentially competing investment firm. Odom, however, maintains that his intention was never to compete with Citigroup, but merely to have a ready-made backup job in the event that he lost his job during the uncertainty of the financial crisis. The jury must decide whom to believe. If the jury believes Odom, it may reasonably conclude that Odom committed only a trivial and, in practice, excusable violation of the policy when he failed to obtain permission to form Armada Advisers.

Therefore, a triable issue of fact remains as to the extent to which Odom's conduct violated Citigroup's policies as they were applied in the Pensacola branch office.

Second, there is a triable issue of fact whether Citigroup's response was out of line with its normal disciplinary procedures. Odom testified that the normal procedure for dealing with policy violations, especially minor ones, was to send "letters of education" to employees. Citigroup merely responds that it had the right to fire him for violating these policies. Taken in the light most favorable to Odom, the decision to terminate Odom rather than take less severe disciplinary action could lead the jury to conclude that Citigroup was motivated by something other than the policy violations.

Third, the timing of Citigroup's termination decision casts some doubt on its legitimacy. Odom testified that he was strongly pressured by a senior executive to

sign a form waiving all his claims against the company. Just a month later, Botos received word that he had sent a form to a client without permission. She called senior management about the issue, decided in response to the form to search for additional business activities of Odom, and made the decision the same day to fire him. Such a hurried decision to fire a 17-year veteran for what could be construed as two relatively minor policy violations, coming shortly after applying aggressive pressure on Odom to waive his claims against the company, could lead a jury to conclude that the termination was about something other than mere violations of these policies. Further, there appear to be factual disputes whether Botos was required to ask Odom to explain his conduct, and whether she actually asked him to do so. (*See* Doc. 141 at 8; Doc. 130 at 3; Doc. 140 at 7; Doc. 155 at 5).

Taken as a whole, and in the light most favorable to Odom, Odom has produced enough evidence of pretext: Citigroup wanted Odom fired, and it tried to pressure Odom to release his claims against the company; when it failed to do so, it deviated from its past enforcement methods and fired Odom for two fairly minor, otherwise excusable, violations of company policy. Such a narrative, while certainly not compelled by the record, is not beyond the realm of plausibility for a reasonable jury.

Odom has therefore raised a triable issue of fact whether Citigroup's reasons for firing him were a pretext for retaliation against his protected conduct. Odom's

claim for retaliation against him objected to Citigroup's blanket hold policy on the Citi preferred securities should thus proceed to trial.

## IV.   CONCLUSION

I therefore find that Odom's claims about the Citigold checking accounts fail as a matter of law, because he could not have reasonably believed that such activity was illegal. I find, however, that numerous factual issues remain in dispute in Odom's claims about the Citi preferred securities. Odom has produced sufficient evidence, taken in the light most favorable to him, that could convince a jury both that he has made out a prima facie case for whistleblower retaliation and that Citigroup's stated reasons for firing him were pretextual.

The relief requested in Defendant's Motion for Summary Judgment (Doc. 130) is **GRANTED IN PART, DENIED IN PART.** The motion is granted for the claims about the Citigold checking accounts; those claims are **DISMISSED WITH PREJUDICE.** The motion is denied as to the claims about the Citi preferred securities; those claims must proceed to trial.


**ORDERED** on November 20, 2014.

**/s/ Richard Smoak**
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**